On the morning of September 26, 1944, at about 7 o'clock (daylight saving time), at the corner of Prytania and Second Streets, New Orleans, there was a collision between a Ford automobile owned and driven by plaintiff, John W. Culver and a taxicab owned by Toye Brothers Yellow Cab Co., a partnership, and operated by Hopson Duncan, an employee of the said partnership.
Culver was driving his Ford down Prytania. Street and the Yellow Cab was on Second Street going towards St. Charles Avenue from the Mississippi River. Plaintiff alleges that the accident was caused solely by the negligence of the driver of the taxicab and he prays for judgment against the partnership, known as Toye Brothers Yellow Cab Company, and the individual members thereof, for $281.65, alleging that to be the cost of making the repairs to his Ford, of having it towed from the scene of the accident to the repair shop and the value of two fog lights which were so badly damaged that they could not be repaired and which, at that *Page 297 
time, could not be replaced. Apparently, plaintiff suffered no physical injury.
Plaintiff charges negligence in the driver of the taxicab in the following particulars: That he was driving at an excessive rate of speed of more than forty-five miles an hour and that he disregarded a "Slow" sign on Second Street which required traffic on that street to reduce its speed. He also charges that though the Ford entered the intersection first, the driver of the taxicab failed to reduce its speed and to permit plaintiff to continue across the intersection.
Defendants admit the occurrence of the accident, the ownership of the cab and that Duncan was in its employ but aver, as a first defense, that at the time of the accident the said employee was not acting within the scope of his employment. They further aver that there was no negligence on the part of Duncan; that the collision resulted solely from negligence of the plaintiff and, in the alternative, they aver that if it appears that Duncan was in any way at fault, the proximate cause of the accident was the contributory negligence of plaintiff, himself. They charge the following acts of negligence against him; That he failed to accord the right of way to the taxicab which had preempted the intersection and which they say had traversed more than half thereof; that he was driving his Ford at an excessive speed which they fix at from 35 to 40 miles an hour; that he failed to maintain a lookout for vehicles on Second Street.
In the First City Court of New Orleans there was judgment for plaintiff as prayed for and defendants have appealed.
We first consider the defense that at the time of the occurrence the driver of the taxicab, though an employee of defendants, was not acting within the scope of his employment. On that feature of the case the following are the important facts: Duncan, an employee of defendants, at about 6 o'clock in the morning, reported for work and was assigned a cab. It seems to be conceded that he was assigned no particular district in which he should operate the cab and no station to which he should report, but that he could "cruise" wherever he thought he might find persons who might desire the use of a cab.
Just after leaving the garage of the cab company, he was hailed at the corner of Magazine and Poeyfarre Streets by two other cab operators, employees of defendants, who were not on duty and who were friends of his. These two other cab drivers, Otis Dunn and Leonard Thomas, desired to be driven to their respective homes. Thomas lived in a housing project near the corner of St. Mary and Annunciation Streets; Dunn lived at No. 1723 Clio Street.
Duncan did not "pull the flag" on the meter of the cab and says that he did not intend to charge these two men for taking them to their respective homes. They first went to the home of Thomas and then Dunn, who had been seated on the rear seat of the taxicab, got into the front of the cab and sat on a "kind of tool box" alongside Duncan, the driver. Duncan drove his cab in an uptown direction as far as Second Street and was on his way out that street towards St. Charles Avenue when the accident occurred.
Obviously he had not proceeded in a direct route from Thomas' home towards the residence of Dunn as he had gone some six or eight blocks further uptown than was necessary had he intended to go directly to the home of Dunn.
While Duncan says that he was taking Dunn to his home, he also says that it was his purpose to drop him on the comer of Clio Street and St. Charles Avenue "provided he picked up a load between there." It is shown that Thomas had paid no fare when he left the cab and, as they had not yet reached the home of Dunn when the accident occurred, he too had paid no fare. However, when he was asked whether he had "any intention of paying" for the ride, he answered: "Well, I had money." Later when he said that on other occasions he had ridden in other cabs of the defendant partnership, he added: "I usually pay." Still later he was asked if he intended to pay for that particular ride and he answered: "Yes, I think I did."
His testimony as to his intention to pay does not impress us for several reasons. *Page 298 
In the first place we are convinced from the record that in spite of the company orders and in spite of regulations of the Federal Office of Defense Transportation, it was customary for drivers on such occasions to ride one another without charge. In the second place, the driver says that he did not "pull the flag" and had no intention of making a charge. Surely Dunn, being himself a cab driver, must have noticed that the flag was not "pulled." Furthermore when Thomas left the cab, Dunn changed his position from the rear seat to the box alongside the driver in the front, which box was not a seat at all. This, we think, evidences that the two men were rather close friends, and it is further shown that although at that time there was between the driver and Dunn no relationship by blood or affinity, shortly afterwards they became brothers-in-law. However, as we have said, the record shows that Dunn, a witness placed on the stand by defendants, said that it was his intention to pay for his ride. We think then that he was a passenger for hire. In carrying him the driver of the cab was acting within the scope of his employment.
It is argued that even if Dunn had paid or had intended to pay, still the driver was not acting within the scope of his employment as he had not "pulled the flag" on the meter and had thus failed to record the fact that he was carrying paying passengers. This failure on his part, had the fare been paid or had he intended to collect one, might have indicated no more than his intention to keep the entire fare for himself and not to account for it in his settlement with his employers. Surely, however, in such a case, an employer cannot be heard to say that an employee who may have failed to account for a fare, has, in carrying a passenger who has paid the fare, not acted within the scope of his employment.
Even if defendants are not bound by the testimony of their witness, Dunn, who says that he was a "pay" passenger, still we think that for other reasons which we shall now give it must nevertheless be held that at the time of the occurrence Duncan was acting within the scope of his employment.
[1-4] While the record is not clear on the subject, we think that it sufficiently appears that Duncan and the other drivers of defendant company are given cabs and are permitted to cruise wherever business may be best. Therefore, since Duncan was not proceeding directly from the residence of Thomas to the home of Dunn but was going six or eight blocks further uptown so that he might enter St. Charles Avenue and drive in a downtown direction, and was apparently hoping that by doing so there would be more opportunity for him to find a paying passenger, he was, in taking that route, "cruising" for business. By his own testimony he states that if he found a passenger he would drop Dunn on St. Charles Avenue and would not go all the way to his residence. Then too, it is well settled that where an employee, under such circumstances is in charge of a vehicle of an employer, there is a presumption that he is using it within the scope of his employment, and it is also well settled that if the employer, under such circumstances. finds it necessary to defend an action of this kind on the ground that the employee was not acting within the scope of his employment, the burden of overcoming the presumption is on him, the employer. Middleton v. Humble, La. App., 172 So. 542; May v. Yellow Cab Co., 164 La. 920, 114 So. 836; Johnson v. Jim Brownlee, Inc., 13 La. App. 86, 127 So. 127. There is another rule of law which is well established in Louisiana and that is that although an employee under such circumstances may have departed from his route and may thus have been acting outside the scope of his employment, as soon as he definitely intends to return to his employment and commences to carry out that intention, he returns to his character as an employee. Anything done thereafter is done within the scope of his employment. "The Factor of Route in the Doctrine of Re-entry in Louisiana" 14 Tulane Law Review 72. For all of these reasons we have no hesitation in saying that at the time of this accident the record shows that Duncan, as a matter of law, was acting within the scope of his employment.
[5, 6] When we come to consider the question of fault we are at once impressed with several facts which indicate that there *Page 299 
must be little doubt about the extreme carelessness of Duncan, the operator of the taxicab.
It is shown that Prytania Street is one of the principal thorofares of the City of New Orleans, whereas Second Street, though paved, is a cross street on which the traffic is much more limited. The record shows too that under authority of the City Traffic Ordinance No. 17702, the Police Department in recognition of the comparative importance of the two streets had placed "Slow" signs on Second Street under which vehicles proceeding in either direction on that street were required to reduce speed before entering the intersection of Prytania Street. In spite of these facts it is made quite certain that the taxicab entered the intersection at a high rate of speed and obviously without its driver having made certain that on the favored street there was no other automobile near enough to render it safe for him to attempt to cross.
Plaintiff says that the taxicab entered the intersection at 45 miles per hour or more and while Duncan fixes his speed at between 8 and 10 miles per hour, plaintiff's estimate seems nearer correct because the action of the taxicab after the injury is highly indicative of excessive speed. It continued across Prytania Street, mounted the curb of Second Street, went some distance further and then rolled back to the paved portion of Second Street and turned over at a considerable distance from the corner of Prytania Street. Plaintiff fixes this distance at 160 feet — Duncan says it was 25 or 35 feet from the corner. One of the police officers who investigated the accident says that "the Yellow Cab was about 75 or 100 feet down the street; it was turned over, laying on its side." The other police officer, though he admitted that he was merely estimating the distance, said that the taxicab "was about 90 feet or so from the intersection of Prytania Street." Although it is shown that in the intervening corner of Prytania Street, (that is the uptown, river side corner) there is a cast iron fence which considerably obstructs the view, it appears that a careful driver could easily see through this fence and could see a car on the other street. Duncan attempted to explain his failure to see plaintiff's car by saying it was not on the right hand side of Prytania Street where he would have seen a car going downtown but was on the left or far side of that street. This explanation does not impress us as it is plain that since the street is only about 35 feet wide, had he looked into the direction from which Culver's car was coming he could not have failed to see that car, whether it was on the left or on the right side of Prytania Street.
We think too that his statement that the Culver car was on the left side of Prytania Street is not borne out by the record. The testimony itself, we think, is to the contrary and the physical facts also prove the contrary. We say this for the following reasons: As Culver was proceeding down Prytania Street, when he saw the Yellow Cab dash out Second Street directly into his path, it flashed into his mind that he might avoid a collision by swerving to the left into Second Street and thus proceed alongside the Yellow Cab. In spite of this swerve, he crashed into the left side of the fast moving Yellow Cab near its rear. The cab continued across in front of him, no doubt dragging his car a little bit more to its left. Yet, after the accident, the Ford was found, not in Second Street where it would have been after this maneuver, if it had originally been on the left side of Prytania Street, but still on Prytania Street a little below the corner of Second Street. These facts make it obvious that Culver was proceeding down Prytania Street at about the center, or possibly a little to the right, and that he swerved to the left in hope that he could avoid the Yellow Cab.
Duncan offers still another explanation of his failure to see the Culver Ford. He says that Culver's lights were not burning. The record convinces us that lights were not necessary at the time. It was on the 26th of September at about 7 o'clock daylight saving time, which is about 6 o'clock standard time, and the evidence preponderates to the effect that at that time lights were not actually necessary. We repeat that we have no doubt at all about the negligence of Duncan and therefore pass to a consideration of the question of whether *Page 300 
Culver," himself, was guilty of contributory negligence.
The record does not indicate excessive speed on the part of Culver — his car proceeded only a few feet beyond the point at which the two vehicles met and it came to rest against the curb of Prytania Street just below the intersection. It is true that its speed was somewhat retarded by the impact but had it been going at an excessive rate we feel sure that when the fast moving taxicab crossed in front of it and pulled it sharply to its left it would have turned over, or at least would have continued considerably further than it did.
The fact that the Ford ran into the side of the cab does not indicate that the latter had preempted the intersection because it is evident that only the excessive speed of the taxicab was responsible for the fact that that vehicle reached the center of the intersection first. Had both been travelling at reasonable speeds or had the speed of the taxicab been substantially reduced as it reached the "Slow" sign on Second Street, the Ford would have entered first, and, no doubt, would have crossed in safety. While it is true that usually the motorist who preempts an intersection has the right to proceed, still the fact that a vehicle, because of its speed enters an intersection first, does not relieve its driver of responsibility for an ensuing accident, when it appears that he dashed out into the intersection in the face of an on-coming vehicle.
Driefus v. Levy, La. App., 140 So. 259; Johnson et ux. v. Fabacher et al., La. App., 175 So. 129.
That Culver did not see the taxicab sooner is attributable to the fact that because of its high speed it was some distance away when he looked and to the obstruction to view furnished by the fence. While it was possible for him to see through that fence, there is no doubt that it interfered greatly with his view.
Obviously, the real cause of this accident was the excessive speed of Duncan, the driver of the taxicab. We are well convinced that he permitted his cab to dash out into the intersection when Culver's car was already so close to it that he could not bring it to a stop. As a matter of fact, the record shows, without objection, that Duncan was convicted in the Criminal Court on charges of reckless driving made against him.
Our conclusions as to the preponderance of the evidence concerning various facts are reached without giving much attention to the testimony of the witness, Dunn. It was shown that his testimony was entirely unreliable. His statements made in the trial of this case differed in important details from those made by him at the criminal trial of Duncan, and his explanation is that he was drunk at that trial and that the statements made then were therefore not reliable. For this and other reasons we have practically diregarded the testimony of this witness.
The judgment appealed from is affirmed at the cost of appellants.
Affirmed.